UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

PETER KNOWLES,

        Plaintiff,

   v.

CITY OF BENICIA, Police Chief
SANDRA SPAGNOLI, City Manager
JIM ERICKSON, Sergeant FRANK
HARTIG, Sergeant BOB
OETTINGER, Sergeant CHRIS
BIDOU, Sergeant SCOTT
PRZEKURAT, Officer JOHN
MCFADDEN, Officer MARK
MENESINI, Officer JAMES
LAUGHTER, Officer KEVIN ROSE,
Officer JASON EAKIN, Officer,
TED CRIADO, Officer JAKE
HEINEMEYER, and DOES 1 through
XXX, inclusive,

        Defendants.
_____/

NO. CIV. 2:09-3470 WBS DAD

MEMORANDUM AND ORDER RE:
MOTION FOR SUMMARY
ADJUDICATION

----oo0oo----

        Plaintiff Peter Knowles brought this action against

defendants City of Benecia, Police Chief Sandra Spagnoli, City

Manager Jim Erickson, Sergeants Frank Hartig, Bob Oettinger,

Chris Bidou, and Scott Przekurat, and Officers John McFadden,

Mark Menesini, James Laughter, Kevin Rose, Jason Eakin, Ted
Criado, and Jake Heinemeyer, arising out of a series of alleged
civil rights violations.   The Complaint alleges various claims
pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth,
and Fourteenth Amendments.

Plaintiff now moves for summary adjudication on the
issue of Frank Hartig's liability for violating plaintiff's
Fourth Amendment rights by "arresting [plaintiff] in the attached
garage at Plaintiff's residence without probable cause, consent,
exigent circumstances, or a warrant" on December 23, 2007.[1]
([Proposed] Order Granting Pl.'s Mot. for Summ. Adjudication
(Docket No. 45).)

I.   <u>Factual and Procedural Background</u>

Plaintiff alleges that Benecia police officers violated
his constitutional rights on six different occasions, the first
of which is relevant to the instant motion.   The first occasion
resulted in a state criminal case against plaintiff.   In the
criminal case, plaintiff moved to suppress the evidence; the
trial court denied the motion, but was reversed on appeal.   <u>See</u>
<u>People v. Knowles</u>, No. VCR200106 (Cal. App. Dep't Super. Ct. Apr.

---

[1]      Hartig objected to plaintiff's reply as containing a
new argument (Pl.'s Reply to Mot. for Summ. Adjudication (Docket
No. 77)) and new evidence (Mehta Decl. Re Reply in Supp. of Pl.'s
Mot. for Summ. Adjudication (Docket No. 78)).   (<u>See</u> Def. Hartig's
Objections to New Evidence & Argument Submitted with Pl.'s Reply
in Supp. of Mot. for Summ. Adjudication (Docket No. 82).)
Plaintiff filed a response to the objection, arguing that his
reply did not raise a new argument or new evidence and, in the
alternative, agreeing to continue the hearing to allow Hartig to
respond.   (Pl.'s Req. to Reply & Reply to Def. Hartig's
Objections to New Evidence & Argument Submitted with Pl.'s Reply
in Supp. of Mot. for Summ. Adjudication (Docket 83).)   The court
continued the hearing and allowed Hartig the opportunity to
respond.

6, 2009).

Plaintiff relies primarily on Hartig's testimony at the trial court's suppression hearing to support the instant motion. Hartig relies primarily on his deposition testimony in the instant action to oppose the motion.  Hartig's testimony is substantially similar, although it does differ in some respects, which the court notes below.  Where the testimony differs, the court views the evidence in the light most favorable to Hartig and draws all justifiable inferences in his favor because he is the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

A.  Hartig Testimony at Suppression Hearing

On December 23, 2007, Hartig was citing another driver in a gas station parking lot at 10 Solano Square when he heard "the sound of a revving engine and tires breaking traction." (Mehta Decl. in Supp. of Pl.'s Mot. for Summ. Adjudication ("Mehta Decl.") Ex. A ("Hartig Test.") at 4:10-13, 4:24-27 (Docket No. 43).)  Hartig believed that the sound was from a red Jeep vehicle exiting a Safeway parking lot adjacent to 10 Solano Square, coming out onto the 100 block of Military West.  (Id. at 4:18-21.)  The sound drew Hartig's attention because "[i]t was midnight, and it's illegal, and it was loud, and it's a moving infraction."  (Id. at 5:1-2.)

The vehicle "continued to accelerate" and break traction and, as the driver passed Hartig, the driver "kind of let off the gas a little bit" and "kind of looked in [Hartig's] direction" and Hartig looked at the driver.  (Id. at 5:7-12.) The vehicle then accelerated into the 300 block of Military West,

3

1 reaching an estimated speed of "at least 60 miles an hour." (<u>Id.</u>

2 at 5:10-16.)  The speed limit is thirty-five miles per hour where

3 Hartig first observed the vehicle; it then changes to forty miles

4 per hour. (<u>Id.</u> at 5:17-19.)  Hartig then told dispatch the

5 description of the vehicle and driver and "advised them what was

6 going on."[2] (<u>Id.</u> at 5:22-24.)  After giving the driver in the

7 parking lot "his stuff back," Hartig attempted to catch up to the

8 vehicle. (<u>Id.</u> at 5:24-26.)

9       Hartig "continued westbound towards the west side of

10 Miliary where [he] completely lost sight of the vehicle." (<u>Id.</u>

11 at 6:13-15.)  Another officer informed Hartig that he had

12 observed taillights further down Military West, but Hartig later

13 determined that it was not the vehicle that he had seen. (<u>Id.</u> at

14 6:15-18.)  Hartig continued to drive and eventually took a right

15 onto South Hampton Road. (<u>Id.</u> at 6:18-26.)  Hartig then

16 "observed the red Jeep coming, as if it had not stopped, at West

17 7th to South Hampton," and the vehicle drove past Hartig in the

18 opposite direction. (<u>Id.</u> at 6:26-7:5.)  Hartig looked at the

19 driver and "assume[d] [the driver] saw [Hartig]," and the vehicle

20 "accelerated and took off again out of [Hartig's] view." (<u>Id.</u> at

21 7:7-9.)  When asked how fast the car was traveling, Hartig

22 stated: "The speed limit is, I believe, 35 in that area.  Maybe a

23

24      [2]    Plaintiff requests that the court take judicial notice
of the "CAD printout," which appears to be a computer-generated
25 police dispatch report.  The court denies plaintiff's request
because the fact is "subject to reasonable dispute." Fed. R.
26 Evid. 201(b); <u>see, e.g.</u>, <u>Garber v. Barragan</u>, No. CV 07-7254, 2009
WL 1649071, at *1 (C.D. Cal. June 9, 2009) ("The LAPD call
27 record, the LAGSD police incident log report, and the Report of
Office Hearing . . . are not proper subjects of judicial
28 notice.").

1   little bit faster in that area." (_Id._ at 7:12-13.)

2          Hartig did not have his lights or sirens activated.
3   (_Id._ at 7:14-16.)  Hartig then told two officers at Military West
4   and South Hampton that the vehicle "[was] coming right at [them]"
5   and they "kind of stood by." (_Id._ at 7:18-21.)  After finding a
6   place where he could make a safe U-turn, Hartig then "gave chase,
7   accelerated trying to catch up." (_Id._ at 7:21-23.)  When one
8   officer told him that the vehicle never showed up, Hartig
9   "figured" the vehicle turned onto Devonshire, a side street off
10  of South Hampton. (_Id._ at 7:23-26.)

11         After turning onto Devonshire, Hartig went down the
12  first court on a "hunch," and he then "observed the taillights
13  pulling into a residence on Stuart Court." (_Id._ at 7:27-8:1.)
14  When Hartig first observed the vehicle, it was pulling into the
15  garage or into the driveway, and eventually the vehicle stopped
16  in the garage. (_Id._ at 8:2-10, 9:25-10:4.)  Hartig then parked
17  his vehicle probably in the street or partially in the street and
18  the driveway. (_Id._ at 10:15-17.)  Without a warrant, Hartig ran
19  up the driveway and into the garage. (_Id._ at 8:13.)  Hartig
20  "made contact with the driver, pulled him out of the vehicle and
21  handcuffed him." (_Id._ at 8:15-16.)  Hartig stated that he also
22  turned the ignition off. (_Id._ at 10:10-11.)  The driver was the
23  plaintiff.

24         Hartig stated that his reasons for arresting plaintiff
25  were that "[h]e had already evaded [him] and what [he] considered
26  the exhibition of speed, or breaking traction, down Military
27  West." (_Id._ at 8:18-20.)  Hartig observed "[w]ithin just a
28  couple of minutes of taking [plaintiff] out of his vehicle" an

odor of alcohol on his breath, bloodshot eyes, and balance that "wasn't real great." (Id. at 8:24-27, 16:8-11.)  Hartig also later observed slurred speech. (Id. at 8:27-28.)  Hartig later determined that plaintiff was intoxicated beyond the legal limit. (Id. at 9:4-10, 16:15-16, 17:3.)

While plaintiff was charged with driving under the influence, "he was originally arrested for reckless driving and the exhibition of speed." (Id. at 9:12-14.)  Hartig agreed that his "obligation" when he entered the garage was to arrest the driver for speeding (id. at 10:25-27), but he "suspected" driving under the influence.  (Id. at 11:10-16.)

When Hartig searched plaintiff's wallet, he found a Safeway receipt in it.  (Id. at 13:2-11.)  Hartig also had the vehicle searched and towed from the garage.  (Id. at 13:28-14:1.)

B.   Hartig Deposition Testimony in Instant Action

Hartig testified at his deposition that he heard breaking traction, which means "burning rubber." (Full Hartig Dep. at 148:10-13.[3])  The loss of traction is "an acceleration where the friction of the tires cannot grab the asphalt, because the tires are spinning so fast." (Id. at 148:16-19.)  Hartig estimated that the loss of traction lasted three to five seconds. (Id. at 148:22.)  Hartig assumed that the breaking of traction started as the vehicle turned out of the parking lot.  (Thornton

---

[3]     This portion of Hartig's deposition was not included in the portion of the deposition attached to the affidavit.  A paper copy of the full deposition was provided to the court pursuant to Local Rules 133(j) and 250.1(a).  A court may consider other materials in the record not cited on a motion for summary judgment.  Fed. R. Civ. P. 56(c)(3).  The court will cite the paper copy of the full deposition as "Full Hartig Dep."

1  Decl. in Supp. of Defs.' Opp'n to Pl.'s Mot. for Summ.

2  Adjudication ("Thornton Decl.") Ex. A ("Hartig Dep."), at 153:23-

3  154:4 (Docket No. 72).)

4         Hartig stated that he had his strobe lights on at the

5  time and that he and the driver "looked at each other" and that

6  Hartig "got a good visual look at him."[4]  (Thornton Decl. Hartig

7  Dep. at 158:25, 156:9, 156:19-20.)  Hartig "felt" that they "made

8  eye contact."  (Id. at 158:16-17.)  Hartig then told dispatch

9  that "there was a white male in a lifted red Jeep with big tires,

10 wearing a--either cap or hat--black cap or hat--that was breaking

11 traction, all over the road."  (Id. at 157:1-4.)  Hartig

12 described the vehicle as "all over the road" because it was

13 breaking traction: "You don't have control of the vehicle when

14 your rear tires are spinning.  In my opinion, you are all over

15 the road; you have no control."  (Id. at 157:7-10.)

16        Hartig made clear that his opinion that the driver was

17 not in control was based on what he heard, not what he saw: "I

18 could hear it.  I didn't see it lose control, but I could hear

19 the tires accelerating.  They weren't grabbing traction, and the

20 vehicle was in a turning movement."  (Id. at 158:9-12.)

21        Hartig decided to pursue the vehicle and to not

22 continue to cite the other driver in the gas station parking lot

23 for the following reasons: "He actually had a couple of things

24 combined.  You've got the speed, the breaking of the traction--

25

26        [4]    Hartig's deposition testimony regarding whether the
   driver of the vehicle looked at him seems to supplement his
   answer at the suppression hearing, in which he stated that the
27 driver "kind of looked in [Hartig's] direction."  (Mehta Decl. in
   Supp. of Pl.'s Mot. for Summ. Adjudication Ex. A at 5:9 (Docket
28 No. 43).)

                                   7

1   which is exhibition of speed.  And taking off after we made eye
2   contact.  There was no doubt he didn't want to be there." (Id.
3   at 161:8-12.)  Hartig supplemented his answer when asked again:
4   "That [other citation] was probably just a mechanical ticket, in
5   all probabilities.  Here I have a moving violation, and I have
6   someone that potentially could be under the influence." (Full
7   Hartig Dep. at 162:8-11.)

8        Hartig also stated: "And I ran up there and gave him
9   his stuff back, because that breaking traction, the erratic
10  driving coming out of that short time, and then followed up by 'I
11  don't want to be here anymore'--that was my perception--was
12  potentially it could be a drunk driver." (Thornton Decl. Hartig
13  Dep. at 163:10-14.)  Hartig did not think that the driver
14  actually saw him return the paperwork to the other driver: "I was
15  probably eight, ten feet off the car.  I think he saw me walking-
16  -potentially he could have seen me walking towards the car [to
17  return the paperwork], but there is no way he saw me return the
18  stuff, because he took off." (Full Hartig Dep. at 161:23-162:2.)

19       Hartig stated that it took him "[m]aybe a couple of
20  minutes" between the time that he last saw the vehicle and when
21  he turned onto South Hampton.[5]  (Thornton Decl. Hartig Dep. at
22  168:18-22.)  Hartig then stated: "So we passed, and I saw the
23  driver--you know, like that--I saw a white male, the truck, as we
24  go by.  And he just floored it again and took off from me." (Id.
25  at 169:25-170:2.)

26

27       [5]   The deposition testimony transcript refers to this road
28  as "Southhampton Road."  For consistency, the court will continue
    to refer to it as "South Hampton Road."

On his decision to turn onto Devonshire when he heard from the officers ahead of him that the vehicle had not reached them, Hartig stated: "And right then I knew if he hadn't gotten to them, he had to have--you know, he could have turned up Hastings, but--I might have seen that.  But I couldn't have seen him turn up Devonshire, so that was the only way he could have gone."  (Id. at 170:11-15.)

On his decision to turn onto Stuart, Hartig stated: "[W]hether it is instinct, good police work, luck--whatever you want to call it--I thought, 'Well, he had to have gone left on Stuart.'"  (Full Hartig Dep. at 173:11-14.)  Hartig stated that at no point did he activate his emergency lights or siren (id. at 174:14-17, 179:13-16), and he does not recall whether he turned on his strobe lights when he parked in front of the residence.  (Id. at 179:22-24.)

While Hartig testified at the suppression hearing that he turned off the ignition of plaintiff's vehicle, when asked at the deposition if the vehicle was still running, he stated:

> I thought about this.
> I thought it was, but right now I don't recall.
> I know that I later reached and took the keys out of the
> ignition, but right now today, did I turn the car off;
> was it running?  I don't 100 percent remember.

(Id. at 182:8-12.)  Hartig's reasons for pulling plaintiff out of the vehicle were: "I was going to place him under arrest for reckless driving, and the breaking traction; the speed contest--that I felt [sic] the laws that he violated right there--which are both misdemeanors--I can effect an arrest.  And to take control of him."  (Id. at 183:5-9.)

When asked what his intent was when he was leading

plaintiff to his patrol car, Hartig seemed to supplement his
previous answer:

> Well, I can smell the alcohol on him now.  Again, going
> up the driveway I truly thought I had a drunk driver,
> too.
>      I have arrested a lot of drunk drivers in my life.
> His actions that night: the speeding of the vehicle, the-
> -I feel the wanton disregard for the way he was driving;
> his safety; my safety; everyone trying to catch up to him
> and locate him--the way he was driving, I truly feel
> that's one of the--his driving observations [sic] were
> consistent with people under the influence.
>      So, as I mentioned, he was getting arrested for
> reckless driving.  When I first--again, when I first
> contacted him is when I smelled the alcohol.  When I got
> him back to the car, there's no doubt that I'm going to
> do at some point a DUI investigation on this.

(Thornton Decl. Hartig Dep. at 185:3-17.)

        Hartig explained what he found in the vehicle that
convinced him that plaintiff was the driver of the vehicle that
Hartig had observed earlier despite plaintiff's denials:

> We talked about the initial--I told him what he had done.
> He denied it, and says he wasn't down there.  And I'm not
> sure if it was at that point where I had opened his
> wallet and found a Safeway receipt.  And honestly I
> probably called him a liar and said, "Look, here you
> were, down there."
>      I don't recall if I said that, but I probably
> explained that.
>      And then when I had--I think it was Officer
> Heinemeyer tow the vehicle, I had him search the vehicle,
> and I believe that--I had him look for a cap.  And sure
> enough, there's a cap in the vehicle.
>      And then I think actually the receipt--the stuff
> that was on the receipt, that was dated about the same
> time this whole thing started--was in the front of the
> car--I believe on the front seat or front floor board of
> the car.

(Full Hartig Dep. 196:15-197:6.)

        C.   People v. Knowles

        The state charged plaintiff with violating California
Vehicle Code sections 23109(a) (speed contest) and 23152(a) and

(b) (driving under the influence of alcohol). <u>Knowles</u>, at 1:20-24. Following the trial court's denial, based on the exigent circumstance of hot pursuit, of his motion to suppress the evidence, <u>id.</u> at 5:15-6:1, plaintiff pled guilty to driving under the influence and appealed the denial of his motion. <u>Id.</u> at 1:22-24. The appellate court reversed the denial of his motion, suppressing all evidence obtained by Hartig after he crossed the threshold of the garage.[6] <u>Id.</u> at 7:7-8.

---

[6] The appellate court found that "the record [did] not support an objective finding that [plaintiff] was attempting to flee from or evade Officer Hartig," <u>People v. Knowles</u>, No. VCR200106, at 4:19-20 (Cal. App. Dep't Super. Ct. Apr. 6, 2009), a finding that the trial court had based "solely on the officer's subjective belief." <u>Id.</u> at 5:4-5. The court found Hartig's observations about the driver of the vehicle looking at him insufficient. The court further explained:

> The record contains no evidence that [plaintiff] even knew police were looking for his Jeep, but only describes Officer Hartig's quest for the Jeep up and down various streets. . . . [T]he description of Officer Hartig's search suggests a substantial lapse in time. The one time Officer Hartig encountered the moving Jeep, it was going the other direction, and there was never any opportunity to try to stop the [plaintiff] as he was driving.

<u>Id.</u> at 4:22-5:4 (footnote omitted). The appellate court then went on to hold that exigent circumstances did not justify the failure to obtain a warrant:

> This is not a case of hot pursuit. Police never actually followed the Jeep. Emergency lights were never activated. There is no evidence that [plaintiff] even knew an officer was looking for him. There was only a hunt and a find on a hunch by a law officer with good instincts. [Plaintiff] did not resist a prior attempt to detain him. [Plaintiff] did not retreat into his house in an effort to avoid arrest. [Plaintiff] was not a fleeing felon. The officer's interest in entering the garage was to arrest [plaintiff] for a traffic violation. [Plaintiff] had already arrived home and presented no threat to public safety. Nor was there further chance for escape.

<u>Id.</u> at 6:16-22.

1  II.   <u>Discussion</u>

2         A party may move for summary judgment on part of a

3  claim.  Fed. R. Civ. P. 56(a); <u>see</u> <u>Dev. Acquisition Grp. v.</u>

4  <u>eaConsulting, Inc.</u>, No. 2:08-cv-03008 MCE JFM, 2011 WL 837162, at

5  *2 (E.D. Cal. Mar. 08, 2011) ("Rule 56 also allows a court to

6  grant summary adjudication on part of a claim or defense.").

7  Summary judgment is proper "if the movant shows that there is no

8  genuine dispute as to any material fact and the movant is

9  entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

10  A material fact is one that could affect the outcome of the suit,

11  and a genuine issue is one that could permit a reasonable jury to

12  enter a verdict in the non-moving party's favor.  <u>Anderson</u>, 477

13  U.S. at 248.

14         The party moving for summary judgment bears the initial

15  burden of establishing the absence of a genuine issue of material

16  fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

17  Once the moving party meets its initial burden, the burden shifts

18  to the non-moving party to "designate 'specific facts showing

19  that there is a genuine issue for trial.'"  <u>Id.</u> at 324 (quoting

20  then-Fed. R. Civ. P. 56(e)).  To carry this burden, the

21  non-moving party must "do more than simply show that there is

22  some metaphysical doubt as to the material facts."  <u>Matsushita</u>

23  <u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

24  "The mere existence of a scintilla of evidence . . . will be

25  insufficient; there must be evidence on which the jury could

26  reasonably find for the [non-moving party]."  <u>Anderson</u>, 477 U.S.

27  at 252.

28         In deciding a summary judgment motion, the court must

12

view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  <u>Id.</u> at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ."  <u>Id.</u>  "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).[7]

A.   <u>Collateral Estoppel</u>

State court judgments may preclude the relitigation of an identical issue that arises in a subsequent federal civil rights action.  <u>Allen v. McCurry</u>, 449 U.S. 90, 103-04 (1980); <u>Hawkins v. Risley</u>, 984 F.2d 321, 323 (9th Cir. 1993).  "Federal courts should apply the state's collateral estoppel law in determining whether a § 1983 claim is precluded by a prior state judicial proceeding."  <u>Presley v. Morrison</u>, 950 F. Supp. 1298, 1305 (E.D. Pa. 1996); <u>see</u> <u>Allen</u>, 449 U.S. at 96.

In California, collateral estoppel will be applied only when certain threshold requirements are met:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have actually been litigated in the former proceeding.  Third, it must have been

---

[7]   Here, Hartig's only evidentiary objection is to the state appellate court decision.  (Def. Hartig's Response to Pl.'s Statement of Undisputed Facts in Supp. of Mot. for Summ. Adjudication (Docket No. 70).)  It appears that Hartig's objection is to the decision only to the extent that it is being offered for the truth of the factual findings and conclusions of law.  Because the decision is not being offered for this purpose, the court overrules the objection.

necessarily decided in the former proceeding.  Fourth, the decision in the former proceeding must be final and on the merits.  Finally, the party against whom the preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

Lucido v. Super. Ct. of Mendocino Cnty., 51 Cal. 3d 335, 341 (1990).

"[I]dentity of parties or privity is a requirement of due process of law."  Clemmer v. Hartford Ins. Co., 22 Cal. 3d 865, 874 (1978).  Privity exists where "the non-party is sufficiently close to the original case to afford application of the principle of preclusion."  People v. Drinkhouse, 4 Cal. App. 3d 931, 937 (1st Dist. 1970); accord Martin v. Cnty. of L.A., 51 Cal. App. 4th 688, 700 (2d Dist. 1997).  The California Supreme Court has held:

> In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication.

Clemmer, 22 Cal. 3d at 875.

The Ninth Circuit has held that police officers are not in "privity" with the prosecution in a criminal case when the officers have "no measure of control" over the proceeding or "direct personal interest" in its outcome.  Davis v. Eide, 439 F.2d 1077, 1078 (9th Cir. 1971) (per curiam).  While Davis was decided before the United States Supreme Court held that federal courts must look to state law to determine preclusive effect, Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984), its reasoning remains sound.  Moreover, the fact that individual officers do not have counsel in connection with a

1  criminal case is "critical" to the determination of whether they

2  had a "full and fair opportunity" to litigate the issue.  See

3  Yezek v. Mitchell, No. C-05-03461, 2007 WL 61887, at *5 (N.D.

4  Cal. Jan. 8, 2007).

5          Several courts in this district have held that a state

6  court's determination that a police officer violated the Fourth

7  Amendment as a way of dismissing a criminal case or suppressing

8  evidence did not bar relitigation of the officer's alleged Fourth

9  Amendment violations in a subsequent civil suit against the

10  officer.  See Adams v. Nocon, No. CIV. S-07-02083 FCD EFB, 2009

11  WL 799278, at *4 (E.D. Cal. Mar. 23, 2009); Saunders v. Knight,

12  No. CV F 04-5924 LJO WMW, 2007 WL 3482047, at *8-9 (E.D. Cal.

13  Nov. 13, 2007); Willis v. Mullins, No. CIVF046542 AWI LJO, 2005

14  WL 3500771, at *6-7 (E.D. Cal. Dec. 16, 2005) ("While police do

15  aspire to enforce the law, individual officers cannot be said to

16  have a personal stake in ensuring conviction."); Sanders v. City

17  of Bakersfield, No. CIV-F 04-5541 AWI TAG, 2005 WL 6267361, at

18  *13-14 (E.D. Cal. Sept. 30, 2005).

19          Because Hartig was not a party or in privity with a

20  party to the state court proceeding, nor did he have a full and

21  fair opportunity to litigate the issue of his alleged Fourth

22  Amendment violation, the decision made by the state court

23  regarding the suppression of evidence has no binding effect in

24  this litigation as to Hartig's liability for a Fourth Amendment

25  violation.

26          B.   Merits of Instant Motion

27          The Fourth Amendment provides: "The right of the people

28  to be secure in their persons, houses, papers, and effects,

15

against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "The Fourth Amendment protects against warrantless arrest inside a person's home in the same fashion that it protects against warrantless searches of the home, which is to say that police officers may not execute a warrantless arrest in a home unless they have both probable cause and exigent circumstances." Hopkins v. Bonvicino, 573 F.3d 752, 773 (9th Cir. 2009) (holding that because exigent circumstances did not justify warrantless home entry, exigent circumstances did not justify warrantless home arrest).

Here, the California statutes for which plaintiff could possibly have been subject to arrest are the statutes prohibiting driving under the influence of alcohol, Cal. Vehicle Code §§ 23152, 23536, engaging in a speed contest or exhibition of speed, id. § 23109, and reckless driving, id. § 23103. Even if probable cause existed, Hartig did not have a warrant, so plaintiff is entitled to summary adjudication if he can show that there is no genuine issue of material fact that an exigency did not exist.

The exigent circumstances exception to the warrant requirement "is premised on 'few in number and carefully delineated' circumstances in which 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search [or seizure] is objectively reasonable under the Fourth Amendment.'" United States v. Struckman, 603 F.3d 731, 743 (9th Cir. 2010) (quoting United States v. U.S. Dist. Ct., 407 U.S. 297, 318 (1972); Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006)) (citation omitted).

The Ninth Circuit has defined those circumstances as

16

1  "(1) the need to prevent physical harm to the officers or other

2  persons, (2) the need to prevent the imminent destruction of

3  relevant evidence, (3) the hot pursuit of a fleeing suspect[,]

4  and (4) the need to prevent the escape of a suspect."[8]  <u>Id.</u>  The

5  parties dispute the applicability of the exigent circumstances of

6  hot pursuit and prevention of the destruction of evidence.

7       In <u>Hopkins</u>, the Ninth Circuit held that the

8  investigation of the misdemeanor of driving under the influence

9  did not create an exigent circumstance.[9]  <u>Hopkins</u>, 573 F.3d at

10 769.  For the following reasons, this court concludes that

11 <u>Hopkins</u> forecloses a finding of an exigent circumstance in this

12 case.

13      The hot pursuit exigent circumstance provides that the

14 "act of retreating into [a] house [cannot] thwart an otherwise

15 proper arrest."  <u>United States v. Santana</u>, 427 U.S. 38, 42

16 (1976).  This exception "only applies when officers are in

17 'immediate' and 'continuous' pursuit of a suspect from the scene

18 of the crime."  <u>United States v. Johnson</u>, 256 F.3d 895, 907 (9th

19 Cir. 2001) (en banc) (per curiam) (quoting <u>Welsh v. Wisconsin</u>,

20 466 U.S. 740, 753 (1984)).  As the name implies, there also must

21 actually be a chase.  <u>Santana</u>, 427 U.S. at 42-43 ("The District

22 Court was correct in concluding that 'hot pursuit' means some

23 sort of a chase, but it need not be an extended hue and cry 'in

24

25      [8]   However, as the Fourth Amendment "ultimately turns on
26 the reasonableness of the officer's actions in light of the
   totality of the circumstances," this is a non-exhaustive list.
27 <u>United States v. Struckman</u>, 603 F.3d 731, 743 (9th Cir. 2010).

28      [9]   <u>Hopkins v. Bonvicino</u>, 573 F.3d 752 (9th Cir. 2009), was
   decided <u>after</u> the conduct at issue in this case.

1  and about (the) public streets.'").

2       The court finds the evidence insufficient to create a
3  genuine issue as to whether a "chase" occurred, as required to
4  establish hot pursuit.  Id.; see, e.g., Struckman, 603 F.3d at
5  744 ("There was no chase here--no 'pursuit' of [the criminal
6  defendant], hot or cold.  [The defendant] was already inside the
7  backyard when the police officers arrived at the house.  Although
8  the officers entered the yard to handcuff [the defendant] and
9  take him into custody, they were not chasing him; [the defendant]
10 immediately stopped walking through the backyard when he saw the
11 officers, and he then complied with their orders.  Those same
12 facts make clear that [the defendant] made no attempt to escape
13 the yard.  Indeed, [the officer] expressly testified that [the
14 defendant] made no attempt to flee.").

15      The evidence only shows that Hartig was searching for
16 the vehicle for a couple of minutes.  The evidence does not show
17 that plaintiff was fleeing from Hartig.  Hartig never activated
18 his emergency lights or siren at any time, even when he saw the
19 vehicle for the second time on South Hampton.  The court finds
20 Hartig's testimony about the driver of the vehicle looking at
21 Hartig before accelerating and exceeding the speed limit
22 insufficient in light of the other evidence.  See Anderson, 477
23 U.S. at 252 ("The mere existence of a scintilla of evidence . . .
24 will be insufficient; there must be evidence on which the jury
25 could reasonably find for the [non-moving party].").

26      The court recognizes that Hartig testified that he
27 "perce[ieved]" that the driver of the vehicle thought, "'I don't
28 want to be here anymore,'" and that "[t]here was no doubt he

18

1   didn't want to be there."  (Thornton Decl. Hartig Dep. at

2   163:12-13, 161:11-12.)  Hartig also testified that when he saw

3   the vehicle on South Hampton the "[driver] took off from me."

4   (Id. at 170:2.)

5           Even if Hartig believed he was engaged in a chase,[10]

6   his subjective beliefs are irrelevant to the hot pursuit exigent

7   circumstance determination.  See Struckman, 603 F.3d at 744 ("In

8   support of its contention that the exigency exception is

9   applicable here, the government relies heavily on [the officer's]

10  testimony that once [the criminal defendant] shed his jacket, he

11  believed that [the defendant] intended to flee or fight the

12  officers free of an encumbrance. . . . [H]owever, an officer's

13  subjective motivation for his actions is irrelevant in

14  determining whether his actions are reasonable under the Fourth

15  Amendment.").  Accordingly, as no chase occurred, the exigency of

16  hot pursuit is inapplicable here.

17          Even if a genuine issue of fact existed as to whether

18  Hartig was preventing the destruction of evidence or in hot

19  pursuit, Ninth Circuit law holds that while the offense being a

20  misdemeanor "does not definitely preclude a finding of exigent

21  circumstances," "it weighs heavily against it."  Johnson, 256

22  F.3d at 908.  In Welsh, 466 U.S. at 753 (rejecting state's

23  attempt to justify arrest of nonjailable offense of driving under

24  influence by relying on hot pursuit, threat to public safety, and

25

26

27  _____

28       [10]   Based on this testimony, it is not even clear that
    Hartig subjectively thought he was engaged in a "chase."

19

1  need to preserve evidence of blood-alcohol level[11]), the Supreme
2  Court held that "an important factor to be considered when
3  determining whether any exigency exists is the gravity of the
4  underlying offense for which the arrest is being made" and that
5  "application of the exigent-circumstances exception in the
6  context of a home entry should rarely be sanctioned when there is
7  probable cause to believe that only a minor offense . . . has
8  been committed."

9      The Ninth Circuit has since "[b]uil[t] on the
10 felony/misdemeanor distinction discussed in Welsh." Hopkins, 573
11 F.3d at 769. But cf. Struckman, 603 F.3d at 745 ("And, while we
12 recognize that 'the exigency analysis must turn on the gravity of
13 the underlying offense, . . . not its status as jailable or

14 _____

15      [11]   The Supreme Court rejected the justifications of hot
   pursuit and threat to public safety without even considering the
16 minor nature of the underlying offense:

17      On the facts of this case, however, the claim of hot
        pursuit is unconvincing because there was no immediate or
18      continuous pursuit of the petitioner from the scene of a
        crime.  Moreover, because the petitioner had already
19      arrived home, and had abandoned his car at the scene of
        the accident, there was little remaining threat to the
20      public safety.

21 Welsh v. Wisconsin, 466 U.S. 740, 753 (1984).  On the
   preservation of evidence argument, the Court held:
22
23      The State of Wisconsin has chosen to classify the first
        offense for driving while intoxicated as a noncriminal,
        civil forfeiture offense for which no imprisonment is
24      possible.  This is the best indication of the State's
        interest in precipitating an arrest, and is one that can
25      be easily identified both by the courts and by officers
        faced with a decision to arrest.  Given this expression
26      of the State's interest, a warrantless home arrest cannot
        be upheld simply because evidence of the petitioner's
27      blood-alcohol level might have dissipated while the
        police obtained a warrant.
28
   Id. at 754.

20

1  nonjailable,' 'the penalty that may attach to any particular

2  offense seems to provide the clearest and most consistent

3  indication of the State's interest in arresting individuals

4  suspected of committing that offense.'" (quoting Hopkins, 573

5  F.3d at 768; Welsh, 466 U.S. at 754 n.14)) (omission in

6  original).  The Ninth Circuit has described Welsh as standing for

7  the proposition "that an exigency related to a misdemeanor will

8  seldom, if ever, justify a warrantless entry into the home."

9  LaLonde v. Cnty. of Riverside, 204 F.3d 947, 956 (9th Cir. 2000);

10  see also Johnson, 256 F.3d at 908 n.6 ("[I]n situations where the

11  underlying offense is only a misdemeanor, law enforcement must

12  yield to the Fourth Amendment in all but the 'rarest' cases."

13  (quoting Welsh, 466 U.S. at 753)).

14       In holding that the investigation of the misdemeanor of

15  driving under the influence was not an exigent circumstance,

16  Hopkins relied on Welsh:

17      Because Johnson and LaLonde relied on and directly cited
        Welsh for the proposition that investigation of a
18      misdemeanor will rarely, if ever, support exigent
        circumstances, it is clear that, whatever 'rare'
19      circumstances might justify a warrantless home entry to
        investigate a misdemeanor, misdemeanor driving while
20      under the influence, the very offense at issue in Welsh
        and cited by Johnson, does not fall within that very
21      narrow exception.

22  Hopkins, 573 F.3d at 769 (citation omitted).  In so holding, the

23  Ninth Circuit disagreed with the California Supreme Court, see

24  People v. Thompson, 38 Cal. 4th 811, 820-28 (2006), which had

25  distinguished Welsh on the basis that Wisconsin's offense of

26  driving under the influence was a nonjailable offense and had

27  held that preservation of evidence of California's jailable

28  offense of driving under the influence was an exigent

1  circumstance.[12]

2  The Ninth Circuit was unpersuaded by <u>Thompson</u>'s

3  distinction:

> [T]his is <u>not</u> the distinction that the United States
> Supreme Court drew in <u>Welsh</u>, nor is it the distinction
> that this circuit has repeatedly emphasized in its own
> exigency-exception decisions.  To the contrary, in <u>Welsh</u>
> the Supreme Court held that the exigency analysis must
> turn on "the <u>gravity</u> of the underlying offense," not its
> status as "jailable" or "nonjailable."   The Court
> specifically said that a finding of exigent circumstances
> is particularly inappropriate "when the underlying
> offense . . . is relatively minor," and cited favorably
> "those courts addressing the issue [that] have refused to
> permit warrantless home arrests for <u>nonfelonious</u> crimes."
> The Supreme Court expressly did not limit its holding in
> <u>Welsh</u> to nonjailable offenses; to the contrary, it
> suggested that exigent circumstances can rarely, if ever,
> support entry into a home to investigate or arrest
> someone for a misdemeanor offense.

13  <u>Hopkins</u>, 573 F.3d at 768-69 (quoting <u>Welsh</u>, 466 U.S. at 753; <u>id.</u>

14  at 750; <u>id.</u> at 752) (omission and second alteration in original)

15  (footnote and citations omitted).

16  The Ninth Circuit in <u>Hopkins</u> further explained why it

17  would not follow the California Supreme Court: "It is the federal

18  courts that are the final arbiters of federal constitutional

19  rights, not the state courts.  This court's precedents make clear

20  that a warrantless home entry to obtain evidence of a misdemeanor

21

22  _____

[12]  The interpretation of <u>Welsh</u> in <u>People v. Thompson</u>, 38
23  Cal. 4th 811, 822 (2006), relied in part on <u>Illinois v. McArthur</u>,
531 U.S. 326 (2001), which involved restraining a suspect from
24  entering his home and in which the Court arguably drew a
distinction between jailable and nonjailable offenses.   <u>Thompson</u>
25  also relied on "[a] substantial majority of [their] sister
jurisdictions hav[ing] limited <u>Welsh</u>'s holding to nonjailable
26  offenses and hav[ing] thereby rejected defendant's extension of
its rule to misdemeanor offenses where imprisonment is a
27  potential penalty."   <u>Thompson</u>, 38 Cal. 4th at 822-23 (collecting
cases).

28

1   offense is 'seldom, if ever' constitutional, and that it was

2   certainly unconstitutional here." Hopkins, 573 F.3d at 769

3   (quoting LaLonde, 204 F.3d at 956) (citation omitted).

4        Subsequent to the Ninth Circuit's decision, which

5   upheld in part the district court's denial of the officers'

6   motion for summary judgment on qualified immunity, the district

7   court granted the plaintiff's motion for summary adjudication on

8   the issue of some of the  officers' Fourth Amendment liability.

9   Hopkins v. Bonvicino, No. C 05-02932, 2010 WL 3743562, at *4

10  (N.D. Cal. Sept. 17, 2010).

11       Similarly, in Kolesnikov v. Sacramento County, No. Civ.

12  S-06-2155, 2008 WL 1806193 (E.D. Cal. April 22, 2008) (Beistline,

13  J.), the court addressed hot pursuit of plaintiffs who were

14  suspected of committing misdemeanors similar to the misdemeanors

15  at issue in this case.  In granting summary adjudication for one

16  plaintiff on the warrantless entry claim, the court relied in

17  part on the relatively minor nature of the offenses: "Although it

18  is clear that the officers were in 'hot pursuit' of [the

19  plaintiff], the fact that [the plaintiff] was only wanted for

20  relatively minor offenses (e.g., misdemeanor reckless driving,

21  misdemeanor evading, misdemeanor resisting arrest and failure to

22  wear a helmet) weighs heavily against a finding of exigent

23  circumstances." Id. at *5 (footnotes omitted). But see id. at

24  *6 (granting qualified immunity)

25       Here, all of plaintiff's possibly applicable offenses

26  were  misdemeanors. See Cal. Penal Code § 17 (defining

27  misdemeanor).  The misdemeanor status of the offenses at issue

28  "weighs heavily" against a finding of exigent circumstances.

23

1  <u>Johnson</u>, 256 F.3d at 908; <u>see also</u> <u>id.</u> at 908 n.6 ("[I]n

2  situations where the underlying offense is only a misdemeanor,

3  law enforcement must yield to the Fourth Amendment in all but the

4  'rarest' cases." (quoting <u>Welsh</u>, 466 U.S. at 753)); <u>LaLonde</u>, 204

5  F.3d at 956 ("[A]n exigency related to a misdemeanor will seldom,

6  if ever, justify a warrantless entry into the home.").

7         In sum, the court finds that <u>Hopkins</u> forecloses the

8  application of the exigent circumstance of preventing the

9  destruction of evidence.  The exigency of hot pursuit is

10 inapplicable because no chase occurred.  Furthermore, the

11 misdemeanor status of the offenses weighs heavily against a

12 finding of an exigent circumstance.  Thus, while probable cause

13 may have existed, the court will grant plaintiff's motion for

14 summary adjudication on the issue of Hartig's liability for

15 violating plaintiff's Fourth Amendment rights by arresting him on

16 December 23, 2007.

17       C.   <u>Qualified Immunity</u>

18       Hartig did not formally move for summary judgment on

19 his defense of qualified immunity, but he opposes the instant

20 motion in part on qualified immunity grounds.  To determine

21 whether an official is entitled to qualified immunity, a court

22 may begin with the question of whether, "[t]aken in the light

23 most favorable to the party asserting the injury, do the facts

24 alleged show the officer's conduct violated a constitutional

25 right?"  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), <u>overruled on</u>

26 <u>other grounds by</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, ----, 129 S.

27 Ct. 808, 818 (2009) (holding that the <u>Saucier</u> two-step procedure

28 for determining qualified immunity in which the court must first

determine whether there is a constitutional violation is not
mandatory).  Here, the court has already found a constitutional
violation.

The second question the court must ask is whether the
officer's conduct violated a clearly established right.  <u>Id.</u>
Finally, if the right is clearly established, the court should
then determine whether a reasonable officer would know that his
conduct violated the clearly established right.  <u>See</u> <u>Anderson v.</u>
<u>Creighton</u>, 483 U.S. 635, 640 (1987).  If the court finds the
constitutional right was clearly established such that a
reasonable officer would be aware that his or her conduct was
unconstitutional, then the officer is not entitled to qualified
immunity.[13]  <u>Pearson</u>, 129 S. Ct. at 816.

With respect to the exigent circumstance of hot
pursuit, the law was clearly established at the time of the
incident that "'hot pursuit' means some sort of a chase, but it
need not be an extended hue and cry 'in and about (the) public
streets.'"  <u>Santana</u>, 427 U.S. at 42-43.  The law was also clearly
established that the exigent circumstance of hot pursuit "only

_____

[13]  "The threshold determination of whether the law
governing the conduct at issue is clearly established is a
question of law for the court." <u>Act Up!/Portland v. Bagley</u>, 988
F.2d 868, 873 (9th Cir. 1993).  The determination of whether a
reasonable officer would know that his conduct violated the
clearly established right is also a question of law.  <u>Id.</u>  A
court may not determine qualified immunity at the summary
judgment stage when there is a factual dispute as to "the facts
and circumstances within an officer's knowledge" or "what the
officer and claimant did or failed to do." <u>Id.</u>  Here,
considering the evidence in the light most favorable to
defendant, and therefore resolving any factual disputes in his
favor, for purposes of ruling upon this motion, the court finds
no factual disputes precluding it from determining the issue of
qualified immunity.

applies when officers are in 'immediate' and 'continuous' pursuit of a suspect from the scene of the crime." Johnson, 256 F.3d at 907 (quoting Welsh, 466 U.S. at 753).

A reasonable officer would know that Hartig's conduct did not amount to a hot pursuit under clearly established law. The evidence only shows a police officer driving throughout various streets in search of a driver who may have committed driving misdemeanors in the officer's presence.  After searching for a couple of minutes, on a hunch, Hartig turned down the street where he found plaintiff.  The evidence does not show that Hartig observed plaintiff fleeing from Hartig or that Hartig activated his emergency lights or siren at any time, even when he spotted the vehicle for the second time.  Hartig's testimony that the driver looked at Hartig, apparently for at most a couple of seconds, before accelerating and exceeding the speed limit, in Hartig's estimate, is insufficient to entitle Hartig to qualified immunity.[14]

With respect to the exigent circumstance of preventing

_____

[14]    Even if a reasonable officer would have believed he was engaged in a hot pursuit, the court would still have to resolve the issue of qualified immunity against Hartig.  In Garcia v. City of Imperial, No. 08cv2357, 2010 WL 3834020, at *8 (S.D. Cal. Sept. 28, 2010), the court, citing Hopkins, held that in 2007 "the law was clear that where there is probable cause to believe that an individual has committed or is committing a misdemeanor only, an officer ordinarily may not enter into the individual's home without a warrant solely to arrest the individual or to investigate the misdemeanor." Id. (emphasis added). However, the court in Garcia found qualified immunity because "it was not clear whether exigent circumstances exist where a suspect in a misdemeanor case flees to a home that officers do not know is his, enters the backyard by jumping over a wall, and ends up in close proximity to points of entry into the residence, which may or may not be occupied." Id.  The circumstances in this case were not out of the ordinary as in Garcia.

the destruction of evidence, even if probable cause existed that

plaintiff was driving under the influence, the law was clearly

established such that a reasonable officer would know in 2007

that an investigation of driving under the influence was not an

exigent circumstance.  In <u>Hopkins</u>, the Ninth Circuit broadly

defined the clearly established law:

> As for the exigency exception, [] our conclusion[] that
> . . . an investigation of a potential misdemeanor
> drunk-driving incident does not create an exigent
> circumstance w[as] clearly established at the time the
> officers broke into the plaintiff's home. . . . It was []
> clearly established by 2003 that "an exigency related to
> a misdemeanor will seldom, if ever, justify a warrantless
> entry into the home."  Moreover, we made clear a year
> later, in <u>United States v. Johnson,</u> that "where the
> underlying offense is only a misdemeanor," <u>such as the
> misdemeanor drunk-driving</u> at issue in <u>Welsh</u>, "law
> enforcement must yield to the Fourth Amendment."
> . . .
> Thus, with respect to the lack of probable cause and the
> lack of exigent circumstances--the absence of either one
> of which would preclude the officers' reliance on the
> exigency exception--the law as to both was clearly
> established in 2003 and the officers are not entitled to
> qualified immunity on the basis of that exception.

<u>Hopkins</u>, 573 F.3d at 771-72 (quoting <u>LaLonde</u>, 204 F.3d at 956;

<u>Johnson</u>, 256 F.3d at 909 n.6) (citation omitted); <u>see also</u> <u>Huff</u>

<u>v. City of Burbank</u>, --- F.3d ----, ----, 2011 WL 71472, at *7

(9th Cir. Jan. 11, 2011).

The Ninth Circuit's qualified immunity holding was not

affected by the California Supreme Court's holding in <u>Thompson</u>.

As <u>Hopkins</u> explained, "a decision by a state court contrary to a

holding of this court cannot unsettle or 'de-establish' the

clarity of <u>federal law</u>. . . . [W]e have held that '[i]n the Ninth

Circuit, we begin our inquiry by looking to binding precedent.

If the right is clearly established by decisional authority of

the Supreme Court or this Circuit, our inquiry should come to an

1  end." <u>Id.</u> at 772 (quoting <u>Boyd v. Benton Cnty.</u>, 374 F.3d 773,

2  781 (9th Cir. 2004)) (second alteration in original).

3          Even though <u>Hopkins</u> was decided after the conduct at

4  issue in this case, this court would have to disagree with the

5  reasoning in <u>Hopkins</u> to find that Hartig is entitled to qualified

6  immunity.  <u>Hopkins</u> effectively forecloses a finding of qualified

7  immunity.  Accordingly, in light of the Ninth Circuit's broad

8  holding in <u>Hopkins</u>, Hartig is not entitled to qualified immunity.

9          IT IS THEREFORE ORDERED that plaintiff's motion for

10 summary adjudication on the issue of Frank Hartig's liability for

11 violating plaintiff's Fourth Amendment rights by arresting him on

12 December 23, 2007, be, and the same hereby is, GRANTED.

13 DATED:  March 24, 2011

14

15 _____

16          WILLIAM B. SHUBB
            UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28